**No. 25-3582**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

BRIAN CALLERY AND TINA FASANO, Individually and on Behalf of All Others Similarly Situated,

*Plaintiffs-Appellees*,

v.

HOP ENERGY, LLC,

*Defendant-Appellee*,

RYAN MELVILLE; MICHELLE MULLANEY; ROBERT MULLANEY; SCOTT MAWHINNEY

*Objectors-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 20 Civ. 3652
Hon. Cynthia M. Rufe Presiding

---

**BRIEF FOR APPELLANTS RYAN MELVILLE, MICHELLE MULLANEY, ROBERT MULLANEY, AND SCOTT MAWHINNEY**

---

**WITTELS MCINTURFF PALIKOVIC**
Daniel J. Brenner
J. Burkett McInturff
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
djb@wittelslaw.com
jbm@wittelslaw.com

**SHUB & JOHNS LLC**
Jonathan Shub
Samantha E. Holbrook
FOUR TOWER BRIDGE
200 BARR HARBOR DRIVE, SUITE 400
CONSHOHOCKEN, PA 19428
Telephone: (610) 477-8380
jshub@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Appellants*

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

STATEMENT OF RELATED CASES AND PROCEEDINGS .......... 3

STATEMENT OF THE CASE .......... 3

I. Introduction .......... 3

II. Statement of Facts .......... 6

SUMMARY OF ARGUMENT .......... 19

STANDARD OF REVIEW .......... 21

ARGUMENT .......... 22

I. The Reverse Auction Settlement Violated Another Federal Court's Order .......... 22

A. The *Callery* Parties Violated the *Melville* Court's ICC Order .......... 22

B. The Settlement Was a Reverse Auction .......... 26

II. The District Court Improperly Applied a Presumption of Adequacy .......... 28

III. The District Court Violated Class Members' Due Process and Rule 23 Protections by Approving Material Alterations to the Settlement Agreement After the Objection and Opt-Out Deadlines .......... 33

IV. The Eleventh Hour Amendment Voided the Agreement .......... 37

V. Callery's Counsel Refused to Exclude Uninjured Capped Price Customers from the Class .......... 39

VI. Material Misrepresentations and Omissions in the Notice Prevented Class Members from Making an Informed Decision .......... 43

VII. The Parties Withheld Key Information from the Court, Which Approved the Settlement on an Insufficient Record ....................................47

VIII. The District Court Failed to Resolve the Factual Dispute Regarding HOP's Ability to Pay by a Preponderance of the Evidence, Even Though That Is the Parties' Primary Justification for the Agreement ..........50

CONCLUSION ........................................................................................55

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 30, 32

*Baum v. Ability Recovery Servs., LLC*,
17-CV-5799, 2018 WL 4853048 (E.D.N.Y. Sept. 27, 2018) .......... 31

*Brooks v. Georgia State Bd. of Elections*,
59 F.3d 1114 (11th Cir. 1995) .......... 34

*Callery v. Delos Capital, LLC*,
23-CV-4784 (E.D. Pa.) .......... 9

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) .......... 41, 42

*Claridge v. N. Am. Power & Gas,*
15-CV-1261, 2017 WL 3638455 (S.D.N.Y. Aug. 23, 2017) .......... 27

*Cox v. Shah*,
187 F.3d 629 (Table) (4th Cir. 1999) .......... 34

*Custom Led, LLC v. eBay, Inc*,
12-CV-350, 2013 WL 4552789 (N.D. Cal. Aug. 27, 2013) .......... 48

*Detterming v. VBit Techs. Corp.*,
22-CV-1482, 2023 WL 4351246 (D. Del. July 5, 2023) .......... 25

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010) .......... 34, 37

*Evans v. Jeff D.*,
475 U.S. 717 (1986) .......... 34

*Figueroa v. Sharper Image Corp.*,
517 F. Supp. 2d 1292 (S.D. Fla. 2007) .......... 27

*Frederick v. Range Res. Appalachia, LLC*,
08-CV-288, 2022 WL 973588 (W.D. Pa. Mar. 31, 2022),
*aff'd*, 22-1827, 2023 WL 418058 (3d Cir. Jan. 26, 2023) .......... 34

*Freeman v. B & B Assocs.*,
790 F.2d 145 (D.C. Cir. 1986) ....................................................................34

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 2015) ........................................................................49

*Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*,
22-1942, 2023 WL 1478999 (3d Cir. Feb. 2, 2023) ............................................43

*Grady v. RCM Techs., Inc.*,
671 F. Supp. 3d 1065 (C.D. Cal. 2023) ..........................................................48

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......................................................................34

*Huber v. Simon's Agency, Inc.*,
84 F.4th 132 (3d Cir. 2023) .............................................................. 39, 40, 41

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
240 F.R.D. 56 (E.D.N.Y. 2006) .....................................................................25

*In re Am. Exp.*,
11-MD-2221, 2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015) ...............................31

*In re AmeriFirst Fin., Inc.*,
No. 23-11240, 2024 WL 3841582 (Bankr. D. Del. 2024) ..................................54

*In re Asbestos School Litig.*,
104 F.R.D. 422 (E.D. Pa. 1984) .....................................................................29

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ........................................................................ 21, 43

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ............................................................. 4, 22, 26, 28

*In re Cmty. Bank of N. Va.*,
622 F.3d 275 (3d Cir. 2010) ........................................................................ 30, 32

*In re Diet Drugs Prods. Liab. Litig.*,
369 F.3d 293 (3d Cir. 2004) ........................................................................ 36, 46

*In re Diet Drugs Prods. Liab. Litig.*,
431 F.3d 141 (3d Cir. 2005) .....36

*In re Diet Drugs Prods. Liab. Litig.*,
553 F. Supp. 2d 442 (E.D. Pa. 2008),
*aff'd sub nom.*, 582 F.3d 524 (3d Cir. 2009) .....34

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .....28

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
934 F.3d 316 (3d Cir. 2019) ..... 21, 22, 53

*In re Hydrogen Peroxide*,
552 F.3d 305 (3d Cir. 2008) *as amended* (Jan. 16, 2009) ..... *passim*

*In re Nat'l Football League Players' Concussion Inj. Litig.*,
961 F. Supp. 2d 708 (E.D. Pa. 2014) ..... 47, 49

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242, 251 (2d Cir. 2011) .....33

*In re Pet Food Prods. Liab. Litig.*,
629 F.3d 333 (3d Cir. 2010) .....22

*In re S. Ohio Corr. Facility*,
191 F.3d 453 (Table) (6th Cir. 1999) .....34

*In re Warner Commc'ns Sec. Litig.*,
798 F.2d 35 (2d Cir. 1986) .....34

*Kars 4 Kids Inc. v. Am. Can!*,
98 F.4th 436 (3d Cir. 2024) .....30

*Kim v. Allison*,
87 F. 4th 994 (9th Cir. 2023) .....31

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011) .....34

*Melville v HOP Energy, LLC*,
21-CV-10406, 2023 WL 4054945 (S.D.N.Y. May 11, 2023) ..... *passim*

*Melville v HOP Energy, LLC*,
21-CV-10406, 2024 WL 4224850 (S.D.N.Y. Sept. 18, 2024).......... 12, 14, 23, 25

*Melville v. HOP Energy, LLC*,
21-CV-10406, 2024 WL 2240280 (S.D.N.Y. May 17, 2024) ..................... *passim*

*Mirkin v. XOOM Energy, LLC*,
No. 18 Civ. 2949, 2020 WL 13890926 (E.D.N.Y. Sept. 6, 2020)........................13

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ..........................................................................................33

*Patterson v. Premier Constr. Co. Inc.*,
15-CV-662, 2017 WL 122986 (E.D.N.Y. Jan. 12, 2017) ...................................48

*Perrigo Institutional Inv. Grp. v. Papa*,
150 F.4th 206 (3d Cir. 2025)..............................................................................43

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) ..............................................................................28

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
04-CV-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ...............................40

*Smith v. Bayer Corp.*,
564 U.S. 299 (2011) ..........................................................................................24

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011)............................................................ 28, 29, 34, 37

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ..........................................................................................40

*Walitalo v. Iacocca*,
968 F.2d 741 (8th Cir. 1992)..............................................................................34

**Rules**

Fed. R. Civ. P. 23(a).............................................................................................30

Fed. R. Civ. P. 23(e) ........................................................................................ *passim*

Fed. R. Civ. P. 23(g) ...........................................................................................25

**Statutes**

11 U.S.C. § 1103(c) ....................................................................................54

11 U.S.C. § 547.........................................................................................54

11 U.S.C. § 548(b) .....................................................................................54

11 U.S.C. § 704(4) .....................................................................................54

28 U.S.C. § 1332(d) ....................................................................................1

28 U.S.C. § 1291 .........................................................................................1

**Other Authorities**

Brian T. Fitzpatrick,
*Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043 (2010)......6

Federal Judicial Center, *Federal Courts and What They Do* 13 (1997)..................38

Manual for Complex Litigation (Fourth), § 21.11.................................................25

"Sustain," Black's Law Dictionary (12th ed. 2024)...............................................38

## JURISDICTIONAL STATEMENT

Plaintiff Brian Callery filed *Callery v. HOP Energy, LLC et al.* ("*Callery*") in the Court of Common Pleas of Pennsylvania, Chester County. [A-47]. Defendant HOP Energy, LLC ("HOP") removed the case to the Eastern District of Pennsylvania under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). [A-86]. Plaintiff twice moved for remand, asserting his claims were worth less than CAFA's $5 million jurisdictional threshold. [A-87]. Both motions were denied. [A-421].

This appeal is from final approval of a class action settlement under Rule 23(e). Appellants are settlement class members that timely objected to the proposed settlement. [A-6]. On December 1, 2025, the District Court overruled Appellants' objections, granted final approval of the settlement, and entered final judgment. [A-4]. Appellants timely filed their Notice of Appeal on December 29, 2025. [A-1]. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the District Court entered a final order.

## STATEMENT OF ISSUES

1. Whether the District Court erred in neglecting a Rule 23(g) interim class counsel order entered by another federal district court that expressly sought to prevent the *Callery* parties from settling the class action claims that were pending before that other court. [A-33, A-425].

2. Whether the District Court erred in approving a class action settlement resulting from a "reverse auction." [A-39, A-420].

3. Whether the District Court erred by applying a presumption of adequacy of representation when determining whether to certify a class for settlement purposes. [A-18, A-428].

4. Whether the District Court erred in allowing post-notice modification of the settlement agreement. [A-42, A-708].

5. Whether the District Court erred in approving a settlement agreement whose express terms rendered it void *nunc pro tunc* due to the parties' post-notice modification. [A-42, A-708].

6. Whether the District Court erred in certifying a settlement class where class counsel refused to remove uninjured class members. [A-31, A-427].

7. Whether the District Court erred in approving class notice that was deficient under due process and/or Rule 23 because it contained material misstatements and omissions. [A-22, A-568].

8. Whether the District Court erred in approving the settlement despite a deficient evidentiary record caused by the parties' withholding of material information. [A-21, A-408].

9. Whether the District Court erred by failing to weigh evidence contradicting the parties' claims about Defendant's ability to pay a reasonable

settlement and failing to resolve this factual dispute by a preponderance of the evidence. [A-40, A-411].

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously.

A related case, *Melville v. HOP Energy, LLC*, 21-CV-10406 (S.D.N.Y.) ("*Melville*"), is a consolidated proposed class action pending in the Southern District of New York. The *Melville* named plaintiffs are several of the Appellants here. The undersigned counsel were appointed by the *Melville* court as interim class counsel ("*Melville* ICC") under Rule 23(g) to represent the proposed *Melville* class in any negotiations to settle their claims. *Melville* is further detailed in the Statement of the Case.

## STATEMENT OF THE CASE

### I. Introduction

The underlying controversy alleges that HOP overcharged its home heating oil customers. This appeal concerns the conduct of Plaintiffs' counsel ("Callery's Counsel") and the District Court's fiduciary responsibility to ferret out self-dealing. The record demonstrates collusion that produced a procedurally and substantively flawed settlement. The settlement seeks to resolve not only this case's claims but also those pending in *Melville*, despite the objections of *Melville* ICC and the *Melville* named plaintiffs.

After motions to dismiss were denied in *Melville* and *Callery*, HOP invoked the "first-to-file" rule in *Melville* and tried to merge the stronger *Melville* into *Callery*. *Melville*, 2023 WL 4054945, at *1 (S.D.N.Y. May 11, 2023), [A-71]. HOP's request was swiftly denied. [A-72–73]. The *Melville* court held that *Melville* and *Callery* involve different categories of HOP's customers, that the claims in the cases were not overlapping, and, therefore, *Callery* was not "first-filed." *Id.*

HOP then started threatening to convene a reverse auction,[1] in which it would use the weaker *Callery* case to settle the claims in both *Callery* and *Melville*. [A-434 ¶ 7]. Expressly acknowledging HOP's threat, the *Melville* court appointed Appellants' counsel as interim class counsel to negotiate settlement of the *Melville* class's claims. [*Id.*]; *see also Melville*, 2024 WL 2240280, at *2 (S.D.N.Y. May 17, 2024) ("ICC Order"), [A-75–81]. Undaunted, HOP sought out Callery's Counsel and hastily convened secret settlement talks while misleading *Melville* ICC about those discussions. [A-434 ¶ 9]. HOP and Callery's Counsel negotiated a deal where HOP would pay $0 out-of-pocket and get a full release of the claims of over 50,000 customers in eight states that had been valued at over $75 million. [A-603–04]. Callery's Counsel would walk away with a large fee. [A-45].

---

[1] A reverse auction occurs when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 308 (3d Cir. 2005).

The *Callery* parties then presented their settlement, justified by HOP's supposed dire financial condition. [A-40]. The parties claimed that if HOP litigated *Melville* or paid ***any sum*** out-of-pocket, class members would "get nothing" because of HOP's looming bankruptcy. [A-674]. That claim was not serious. HOP had approximately $300 million in annual revenue for the years preceding settlement. [A-857]. If the *Callery* parties' claims about HOP's financial precarity were true, ***any*** negative business event would have put HOP into bankruptcy long ago. Yet just before the settlement, HOP acquired an HVAC company for [redacted] [A-414]. Expectedly, HOP continues operations today.

Appellants (represented by counsel that specialize in consumer class actions against energy suppliers) also submitted a "Forensic Accounting Report of HOP Energy, LLC," an expert analysis showing that the *Callery* parties' primary justification was simply false. [A-553].

Appellants further pointed the District Court to the settlement's myriad procedural and substantive deficiencies, including without limitation that: (1) the settlement fund was to pay ***the Defendant's*** legal fees before paying class members, which may have resulted in class members getting absolutely nothing while the attorneys on both sides walked away with all settlement proceeds; (2) the settlement violated the *Melville* court's interim class counsel order; (3) the settlement class had "many" uninjured class members with no way to exclude them; (4) the settlement's

various tiers of customers had inequitable distribution between and among tiers; and (5) class notice misrepresented the distribution plans to customers. [A-405–06].

The District Court rejected almost all these red flags. The one objection the District Court effectively sustained related to requiring the settlement fund to pay HOP's legal fees instead of class members. [A-42]. This required denial of approval because it changed the settlement's key term: How much money HOP would pay class members. In fact, per the Settlement Agreement's (the "Agreement") own terms, this rendered the Agreement void *nunc pro tunc*. [A-156]. The settlement was approved anyway. [A-45].

Class actions serve as a deterrent by forcing entities to pay damages for their wrongs. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2058 (2010). Here, it was error for the District Court to approve a $0 out-of-pocket class action settlement that extinguished stronger claims being litigated in another forum by capable counsel.

## II. <u>Statement of Facts</u>

HOP is a thriving business with a large customer base. [A-412]. While HOP's primary business is selling low-margin home heating oil, HOP expanded to selling high-margin add-on services to its customers. [A-412–13]. In the two years prior to the settlement, HOP spent approximately [redacted] on a

successful acquisition of an HVAC company. [A-414]. HOP also received a $75 million revolving credit facility to support future growth through acquisition. [A-80].

HOP sells home heating oil under five different plans: cash-on-delivery ("COD"), fixed, capped, variable, and promotional variable price plans. [A-397]. COD and fixed price customers are not part of *Callery* or *Melville*. [A-31]. Mr. Callery was a capped price customer. [A-65]. The *Melville* named plaintiffs were variable and promotional variable customers. [A-262]. Capped price customers are charged the lower of a preset "capped" rate or the prevailing retail rate for home heating oil. [A-53 ¶ 9]. Variable customers are charged the prevailing retail rate, and promotional variable customers are charged the promotional prevailing retail rate. [A-262].

Mr. Callery filed a lawsuit on behalf of Pennsylvania residents with an opt-in class of non-Pennsylvania residents, alleging HOP defrauded customers into enrolling in its capped plan. [A-55]. Mr. Callery's theory of liability is that when oil prices were below the capped rate, HOP improperly charged customers the capped rate instead of the lower prevailing retail rate. [A-54]. This class was damaged only when prices fell below the capped rate. [A-398]. Prior to the *Callery* settlement, the District Court observed *Callery* addressed HOP's capped price practices, noting that Mr. Callery alleged "that Defendant committed intentional fraud in pricing oil

deliveries to Capped Program customers," and the "entire class Plaintiff alleges" includes "every capped customer." [*Id.*] (quoting remand denial).

*Melville* is different. The proposed *Melville* class is prosecuting a contract claim on behalf of variable and promotional variable customers, asserting over $75 million in damages. [A-398]. *Melville*'s theory of liability and damages is that HOP breached the variable pricing term in its form contract by charging inflated variable rates. [A-262]. In contrast to *Callery*, where customers were injured only when oil prices fell below the capped rate, the proposed *Melville* class incurred damages whether heating oil prices rose, fell, or held steady. [A-398].

Appellants are not alone in flagging the critical differences between *Melville* and *Callery*. The *Melville* court has repeatedly ruled that *Callery* does not subsume *Melville* and that Callery's Counsel does not represent the variable and promotional variable customers' claims being actively litigated by *Melville* ICC: two law firms, each with over a decade of experience prosecuting class actions against energy companies like HOP. [A-73].

After the motions to dismiss were denied in *Melville* and *Callery*, HOP moved to stay the stronger *Melville* case under the "first-to-file" rule. [A-71]. HOP claimed *Callery* subsumed *Melville*. [A-72]. The *Melville* court rejected HOP's claim and found that the actions "differ substantially" because unlike *Melville*, "*Callery* is based on the theory that Defendant did not honor its Capped Price promise." [A-73].

Thus, *Callery* was not "first-filed." [*Id.*]. Tellingly, HOP made no effort to steer *Callery* into *Melville*.

After its first-to-file gambit failed, HOP proposed a global mediation with the *Melville* and *Callery* parties. [A-399]. The mediation was held December 7, 2023, before Judge Welsh, but it began with controversy. [*Id.*]. The night before, Callery's Counsel filed an ill-advised RICO class action against HOP and ten *Callery* non-parties, including HOP executives and investors. *See Callery v. Delos Cap., LLC*, 23-CV-4784 (E.D. Pa.) (the "RICO Filing"). The RICO Filing publicly disclosed confidential information obtained via discovery in *Callery*; an overt violation of *Callery*'s protective order. [A-399]. Callery's Counsel oddly claimed that its improvident RICO Filing was meant to spur HOP to provide "asset discovery" regarding its ability to pay a class settlement. [A-672]. This makes no sense. Publicly filing HOP's confidential information is no path to asset discovery—especially on the eve of a class action mediation, where continued discussions are often conditioned on providing financial information. At HOP's demand, Callery's Counsel scrambled to dismiss the RICO Filing the morning of the mediation. [A-400].

But the damage was done; public websites posted the unredacted filing with the now-publicized confidential information. [A-399]. The potential repercussions for Plaintiff and Callery's Counsel were immediately apparent: (1) disqualification

as class counsel; (2) disqualification as class representative; (3) contempt; and (4) financial sanctions. [A-399–400]. Faced with the specter of sanctions and losing out on attorney's fees, Callery's Counsel switched focus to settling as quickly as possible. [*Id.*].

While the December 7 global mediation did not result in settlement, all parties continued to participate in settlement talks. [A-383]. [redacted] [A-712]. [redacted] [A-725]. [redacted] [A-712]. On March 4, Callery's Counsel and *Melville* ICC agreed to such a demand. [A-433 ¶ 6]. Callery's Counsel joined in all aspects of that demand and never withdrew. [*Id.*]. [redacted] [A-712].

Yet behind the scenes, HOP seized on Callery's Counsel's compromised position and went all-in on a "reverse auction" to sell a global settlement to the lowest bidder. [A-400]. Despite the *Melville* court's unequivocal first-to-file ruling,

HOP threatened that if Appellants' counsel did not accept a lowball settlement, HOP would use *Callery* to settle *Melville*. [A-400–01].

To counter HOP's reverse auction strategy, *Melville* ICC sought—and the *Melville* court granted—appointment as interim class counsel under Rule 23(g) for variable and promotional variable customers. [A-75]. The *Melville* court's interim class counsel order was expressly intended to stop HOP's reverse auction threat here:

> Understandably, the Plaintiffs in *Melville* and *Mullaney* are concerned that the Defendant's broader view will lead to the negotiation of a settlement in *Callery* that extinguishes all or part of their claims in *Melville* and *Mullaney*. In fact, during a January 9, 2024, conference, when directly asked if he would do so, Defense counsel hedged on whether he would settle any aspect of the *Melville* and *Mullaney* cases as part of a settlement with the plaintiffs in *Callery*. (ECF No. 100-3 at 13– 15). Thus, this Court finds that it would protect the putative classes in *Melville* and *Mullaney* to appoint interim class counsel, ***as it ensures that they will be adequately represented in any settlement involving Callery***.

[A-77] (emphasis added).

The *Melville* court's directive was unambiguous. It later stated that its ICC Order meant "that the *Melville* and *Mullaney* plaintiffs would participate in any settlement that attempted to extinguish their claims," and that "any further settlement negotiations would involve [*Melville* ICC] if the settlement attempted to resolve

claims on their behalf." *Melville*, 21-CV-10406, 2024 WL 4224850, at *6 (S.D.N.Y. Sept. 18, 2024), [A-263–64, 274].[2]

Undeterred, HOP and Callery's Counsel convened a secret mediation that excluded *Melville* ICC. [A-434 ¶ 9]. Meanwhile, both falsely told *Melville* ICC that global settlement discussions were continuing. [A-433–34 ¶¶ 6–8]. Callery's Counsel joined the March 4 demand and never withdrew. [A-433 ¶ 6]. HOP's conduct was worse. When *Melville* ICC raised reverse auction concerns in April 2024, HOP's counsel replied "we have not excluded you from any settlement talks." [A-548] (Email from HOP's counsel to *Melville* ICC). Similarly, during a May 24, 2024 telephone call, *Melville* ICC asked HOP's counsel about the outstanding March 4 settlement demand. [A-507]. Rather than disclose negotiations with Callery's Counsel, HOP's counsel said he would check with HOP and revert. [*Id.*]. *Melville* ICC emailed Callery's Counsel memorializing the call, noting the purpose of the call was "to see if HOP had any response to our global demand," and reporting that HOP's counsel "would check to see if HOP wanted to respond to the March 4 global demand and get back to us." [*Id.*]. The May 24 call and memorialization occurred less than two weeks before HOP and Callery's Counsel reached a deal at their

---

[2] HOP even stated on the record that the appointment would mean "counsel in [*Callery*] wouldn't be permitted to, as far as [HOP] understand[s] the request, . . . to engage in some written negotiations with us and the mediator in connection with [] the potential global resolution" without *Melville* ICC. [A-493–94].

secret mediation. [A-434 ¶ 9]. Yet HOP and Callery's Counsel misled *Melville* ICC into believing global settlement negotiations were ongoing. [A-507, A-548].[3]

In early June 2024, HOP and Callery's Counsel held their secret mediation and, in a single day, settled *Callery* and, purportedly, *Melville*. [A-434 ¶ 9]. To conceal this unauthorized settlement until preliminary approval papers were on file, HOP made several large document productions in *Melville* after the secret mediation but before informing *Melville* ICC of the settlement purporting to extinguish *Melville*'s claims. [A-434 ¶ 10].[4]

The *Callery* parties admit their mediation was scheduled only ***after*** the ICC Order. [A-383]. Callery's Counsel justified this by accusing *Melville* ICC of causing an impasse in the global mediation. [A-286] ("[*Melville* ICC] would not permit the Plaintiffs' side to lower their demand to a number that Defendant was capable of

[3] The District Court relied on two misstatements of fact: (1) *Melville* ICC "turned down any global settlement agreements," [A-33]; and (2) they "failed to remain in contact with Judge Welsh," [A-39]. Both are incorrect. As irrefutably demonstrated by the May 24 communications, there was a ***live*** global settlement demand, joined by both the *Melville* and *Callery* plaintiffs, when the *Callery* parties agreed to the settlement at the secret mediation. Callery's Counsel never withdrew from that demand and HOP never rejected it.

[4] Had HOP not hidden the reverse auction, *Melville* ICC could have taken further action. For example, in another energy class action involving one of the *Melville* ICC firms, a district court made clear that in the face of a "reverse auction," the plaintiffs "would easily be able to stop it in its tracks," including "with sanctions if warranted." *Mirkin v. XOOM Energy, LLC*, 18-CV-2949, 2020 WL 13890926, at *2 (E.D.N.Y. Sept. 6, 2020).

paying."). That is false. Again, Callery's Counsel joined the March 4 global settlement demand and never withdrew. [A-433 ¶ 6]. That demand was still live when the *Callery* parties convened their secret June mediation. [A-434 ¶ 9].

In reality, after *Melville* ICC were appointed, the *Callery* parties scrambled to settle the stronger *Melville* case cheaply for HOP with a quick payday for Callery's Counsel. [A-403]. Indeed, when the *Melville* court confronted HOP's counsel about this, HOP's counsel sheepishly admitted making no effort to preserve *Melville* when settling *Callery*. [A-532] (Mr. McLaughlin: "[T]here was not an attempt to carve [*Melville*] out . . . .").

Appellants are not alone in criticizing this collusive settlement process. The *Melville* court admonished: "[The *Melville*] Plaintiffs have raised potentially valid concerns about how the *Callery* settlement was negotiated without their involvement," and "it does not go unnoticed by the Court that HOP's actions [in trying to use *Callery* to settle *Melville*] may have violated the spirit of the Court's Interim Class Counsel order, if not its explicit terms." [A-274].

The collusive settlement also vastly expanded *Callery*'s scope. When it was executed, the operative *Callery* complaint defined the class as: (1) Pennsylvania customers; and (2) an impermissible opt-in class for non-Pennsylvania customers. [A-55 ¶ 16]. Callery's Counsel amended the complaint only ***after*** executing the settlement and filing preliminary approval papers. [A-91 (Preliminary Approval

Mot., Dkt. No. 85), A-234 (Am. Compl., Dkt. No. 86)]. This post-settlement amendment expanded *Callery* to include non-Pennsylvania residents (on a compliant opt-out basis), variable, and promotional variable customers. [A-240–41]. This amendment also added a new party, variable customer Ms. Fasano, for the first time. [A-234].

In addition to being collusive, the settlement is also inadequate and substantively unfair. Callery's Counsel agreed to a settlement in which HOP's insurance proceeds would contribute a measly $2.3 million to a settlement fund in exchange for releasing claims worth at least $80 million (less than 3% recovery). [A-14, A-372]. Callery's Counsel justifies this lowball settlement because HOP made a self-serving inability-to-pay claim. [A-921] (Callery's Counsel: "[T]his settlement was not based on weighing how much each class member deserved to get. It was how much I could get them based on the available number."). But Callery's Counsel went along with HOP's bankruptcy bluff because it aided their actual goal of exiting with a quick payday rather than risking the consequences of their litigation missteps. [A-399–400].

HOP, a private equity portfolio company with $300 million in annual revenue, was never near bankruptcy. Shortly before the settlement, HOP completed a nearly [redacted] acquisition that Callery's Counsel's own accounting expert admitted [redacted] [A-198]. Appellant's expert

concluded [redacted] [A-558].

Indeed, [redacted] [A-800]. Even Callery's Counsel's accountant noted there was [redacted] [A-198]. Appellants' expert likewise concluded that bankruptcy was "implausible." [A-559].

Critically, owing to the stale financials used to support HOP's bankruptcy claims, Appellant's expert made clear that without "updated financial information and projections of future financial performance, no reasonable person nor the court can make a justified estimate as to HOP's ability to pay a judgment or settlement." [A-556, A-559]; *see also* [A-557] ("The absence of more recent historical financial information and the lack of projections would render any analysis of the current ability to pay a judgment incomplete and outdated.").

As predicted, HOP is still thriving 18 months after the Agreement was executed. Even if the bankruptcy threat were true (it was not), Callery's Counsel took the threat as a certainty that HOP's customers had lost all leverage whatsoever.

[A-641]. Callery's Counsel presented the District Court with a false dichotomy: a deficient settlement where HOP paid nothing out-of-pocket and extinguished a stronger case or recover nothing. [A-674] ("The decision on the settlement was simple. Accept the remaining insurance proceeds or get nothing.").

To rebut this false dichotomy, Appellants sought discovery of HOP's updated financials and projections—which HOP surely had—but the District Court ignored that motion and denied it as moot without further reasoning in the final approval order, almost a year after the discovery motion was filed. [A-9, A-598].

Even without the updated financial information necessary to evaluate HOP's claims of imminent financial ruin, the District Court still failed to properly account for evidence that contradicts this purported justification for the Agreement. For example, Callery's Counsel admitted in a sworn statement that "HOP was willing to contribute to a settlement its own funds in addition to the insurance policy funds available[.]" [A-614] (quoting A-112–13 ¶ 11). But at final approval, Callery's Counsel reversed course: "Plaintiffs entered into the Settlement Agreement because the proceeds of HOP's liability insurance policy are the only asset available to the Class." [A-367]. These contradictory, self-serving statements should not have been glossed over.

Callery's Counsel also hid the Agreement's unfairness from class members by making material misrepresentations and omissions in the class notice (the

"Notice"). [A-568]. For example, the Notice misrepresents the settlement's allocation plan and how much class members would be paid. [A-568–71].

It was only weeks after the opt-out and objection deadlines that Callery's Counsel finally revealed additional information about the settlement. Although still insufficient for the required fairness analysis, the information reveals additional fatal flaws. For example, Callery's Counsel negotiated a deal where, in their own words, "every penny" of defense costs that ***HOP*** pays to defend the settlement "will come directly out of the pockets of the Class."[5] [A-368] (emphasis original). In exchange for this sweetheart deal, HOP agreed not to oppose Callery's Counsel's request for over $800,000 in fees and costs. [A-144–45, A-405–06].

In addition to the staggering procedural improprieties of the negotiation, the Agreement has fatal substantive defects. These include: (1) inadequate compensation; (2) using the settlement fund to first pay HOP's legal fees; (3) including uninjured capped price customers; and (4) the purported motivation for the settlement—HOP's impending financial doom—was factually incorrect and based on stale financials.

[5] The District Court sustained Appellants' objection on this provision while also inconsistently writing that the objection was overruled. [A-6 ¶ 9, A-42].

The District Court made several reversible legal errors by failing to perform the rigorous review this Circuit requires and disregarding the settlement's many substantive and procedural flaws.

## SUMMARY OF ARGUMENT

The District Court made several reversible errors.

First, the settlement was the product of collusion, forged in defiance of the *Melville* court's ICC Order. That order was expressly entered to prevent the *Callery* parties from settling the *Melville* claims without involving *Melville* ICC. To hide their secret negotiations, the *Callery* parties misled *Melville* ICC by feigning their continued participation in global settlement negotiations. Through secret, collusive negotiations, Callery's Counsel traded the interests of absent class members for a quick payday while letting HOP off the hook in both *Callery* and *Melville* for $0 out-of-pocket. The District Court failed to account for the obvious signs of collusion.

Second, the District Court applied an incorrect legal standard: applying an incorrect "presumption" that Callery's Counsel was adequate, improperly shifting the burden to Appellants to disprove adequacy. This Court's precedent puts that burden on the party seeking certification and demands that district courts undertake a "rigorous analysis" of this Rule 23 element. This is especially true in the settlement-only class context where "heightened" attention is required. The record shows that Callery's Counsel failed to meet their burden to establish adequacy.

Third, the District Court failed to protect the due process rights of absent class members and exceeded its authority under Rule 23(e) by materially modifying the Agreement after the objection and opt-out deadlines. Recognizing the inherent unfairness of the class paying HOP's legal fees out of the settlement fund (one of Appellants' objections), the District Court ratified the *Callery* parties' eleventh-hour attempt to excise that offending provision at final approval. A district court is not a party to the settlement and may only accept or reject a proposal in its entirety; it lacks the power to "delete, modify, or substitute" terms after the objection and opt-out deadlines.

Fourth, and relatedly, the Agreement is void by its own terms. The Agreement provides that if any objection were sustained or if the Agreement were not approved substantially in its then-present form, it has no further force and effect, and any resulting order must be vacated *nunc pro tunc*. By materially modifying the settlement fund's composition to remove the provision requiring class members to pay HOP's legal bills, the *Callery* parties and the District Court triggered this self-executing provision.

Fifth, the District Court approved the Agreement even though no effort was made to identify and exclude uninjured capped price class members. Callery's Counsel admitted that it is "virtually certain" that "many" capped class members are uninjured but claimed it was too hard for the settlement administrator to exclude

them, even though it is class counsel's (not the settlement administrator's) obligation to do so. This unfairly dwindles the already miniscule fund available to legitimate class members.

Sixth, the Notice contained material misstatements of fact and omitted material information required for class members to make informed decisions.

Seventh, Callery's Counsel withheld vital information from the District Court and still has not created a sufficient record for the District Court to determine the Agreement's fairness.

Eighth, the District Court overlooked key evidence regarding HOP's ability to pay a settlement, which was the primary justification for this low-ball settlement.

For these reasons, the final approval order should be vacated, the settlement class should be decertified, the *Melville* ICC Order and first-to-file rulings should be enforced, and the case should be remanded for further proceedings.

## STANDARD OF REVIEW

"[A] district court's decision to approve a settlement and to certify a class" is reviewed for abuse of discretion. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 325 (3d Cir. 2019). Such abuse exists "where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013). "However, a district court must make its reasoning

and application of the law clear, so that we, as a reviewing court, have a sufficient basis to review for abuse of discretion." *Google*, 934 F.3d at 325 (quotation omitted).

Further, district courts must "apply an even more rigorous, 'heightened standard' in cases where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (quotation omitted). "[T]his heightened standard is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Id.* (citation omitted).

District courts are class fiduciaries who must "exercise [their] fiduciary duty to assure that the settlement process was procedurally fair." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 318 (3d Cir. 2005) ("*Cmty. Bank I*").

## **ARGUMENT**

### III. The Reverse Auction Settlement Violated Another Federal Court's Order

#### *A. The* Callery *Parties Violated the Melville Court's ICC Order*

The settlement violated the *Melville* ICC Order. The District Court gave two reasons for not holding HOP to that order: (1) it was supposedly not violated, [A-33–34]; and (2) another federal court's Rule 23 order purportedly has no bearing on its decision, [A-34]. This was twice incorrect.

First, the District Court inconsistently characterized the ICC Order. It acknowledged that "*Melville*'s order appointed interim class counsel to ensure the putative classes in *Melville* and *Mullaney* would be adequately represented in any settlement involving *Callery*." [A-33]. However, it then asserted that "the order did not prohibit Plaintiffs and Defendant from engaging in settlement discussions without interim class counsel." [A-33–34]. This would render the ICC Order meaningless. The judge who entered the ICC Order could not be clearer. It meant that "the *Melville* and *Mullaney* plaintiffs would participate in any settlement that attempted to extinguish their claims." [A-274]. Because the *Callery* parties violated that directive, the *Melville* court admonished HOP that "it does not go unnoticed by the Court that HOP's actions may have violated the spirit of the [ICC Order], if not its explicit terms." [*Id.*].

Indeed, HOP understood the ICC Order from the outset. HOP's counsel urged the *Melville* court not to enter the ICC Order because it would mean "counsel in [*Callery*] wouldn't be permitted to, as far as [HOP] understand[s] the request, . . . to engage in some written negotiations with us and the mediator in connection with—with the potential global resolution" without the approval of *Melville* ICC. [A-493]. If the ICC Order were limited to settlement authority in *Melville* but not *Callery*, it would mean nothing; there were no leadership conflicts to resolve in *Melville*. There is no reasonable interpretation of the ICC Order that renders HOP's reverse auction

a compliant act. The District Court abused its discretion in disregarding the clear meaning and issuing judge's explanation of the ICC Order.

Second, the District Court was incorrect that "Objectors cite no case law and make no assertion why this Court must follow an Order entered in a case separate from this one, in an entirely different district, when the first-filed rule determines that this Court is the appropriate venue for this case." [A-34]. The District Court was made aware more than two years earlier that the *Melville* court determined *Callery* was not first filed. [A-72–73]. The District Court's reliance on *Callery*'s supposed first-filed status was an error of law.

Further, Appellants cited controlling Supreme Court authority on this issue; the District Court merely overlooked it, which is itself reversible error. *See In re Hydrogen Peroxide*, 552 F.3d 305, 307, 325 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (reversing for failure to consider "all relevant evidence and arguments . . . whether offered by a party seeking class certification or by a party opposing it").

Specifically, Appellants cited the Supreme Court's directive that district courts "apply principles of comity to each other's class certification decisions when addressing a common dispute." [A-426] (citing *Smith v. Bayer Corp.*, 564 U.S. 299, 317 (2011)). *Melville* ICC were appointed to ensure "that the *Melville* and *Mullaney* plaintiffs would participate in any settlement that attempted to extinguish their claims." [A-274]. Yet the District Court chose to supplant that decision with a

contrary one. This violated the Supreme Court's comity edict, not to mention the ensuing difficulties that would result if district courts were free to ignore Rule 23 orders issued by other federal courts.[6]

Moreover, the Rule 23(g)(3) designation provides sole negotiating authority. The ICC Order's reliance on Rule 23(g) thus granted *Melville* ICC sole negotiating authority for the *Melville* class. "Appointment of interim lead counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, ***and negotiating settlement***." *Detterming v. VBit Techs. Corp.*, 22-CV-1482, 2023 WL 4351246, at *1 (D. Del. July 5, 2023) (emphasis added); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006) (Interim class counsel "ha[ve] the responsibility for . . . negotiating settlement." (quoting Manual for Complex Litigation (Fourth), § 21.11)).

Accordingly, this Court should vacate the final approval order due to its irreconcilable conflict with another federal court's earlier Rule 23 order.

---

[6] If this Court adopts the District Court's rule, Appellants respectfully ask that any opinion affirming the District Court's order expressly direct that the *Melville* court is free to disregard the Rule 23 rulings in this case because it is "a case separate from this one, in an entirely different district."

### *B. The Settlement Was a Reverse Auction*

The settlement unmistakably resulted from a reverse auction, violating Rule 23(e)(2)(B)'s arm's length requirement. *Cmty. Bank I*, 418 F.3d at 308. HOP steered negotiations to the lowest bidder, using *Callery* to extinguish the more valuable *Melville* claims. The Agreement has HOP pay $0 out-of-pocket for a global release that trades over $80 million in damages for less than 3% recovery. [A-604]. For its part, Callery's Counsel secured HOP's commitment not to oppose their request for over $800,000 in fees and costs. [A-144–45]. Indeed, the Agreement required class members to pay ***HOP's*** legal fees to defend the settlement, including in this appeal.

HOP exploited Callery's Counsel's compromised position after a series of disqualifying litigation blunders, including Callery's Counsel's sanctionable RICO Filing that violated *Callery*'s protective order. [A-399]. This shifted Callery's Counsel's incentive from maximizing class recovery to exiting quickly. [A-574]. Callery's Counsel compounded their vulnerability by missing the court-ordered class certification deadline, resulting in the case being placed in the trial pool on an individual basis. [A-24].

Myriad procedural improprieties further indicate a reverse auction:

- The *Melville* court entered the ICC Order specifically to avoid a reverse auction in *Callery*, [A-77];

- The settlement was negotiated after the ICC Order but without *Melville* ICC, even though it seeks to release *Melville*'s claims, [A-130, A-434];

- The settlement was negotiated by counsel representing a capped customer but purported to also release the more valuable variable and promotional variable claims, [A-129, A-716];

- The *Callery* parties each held out that global settlement negotiations were continuing to conceal the secret negotiations that excluded *Melville* ICC, [A-548, A-713–14];

- To preserve secrecy, HOP produced thousands of documents in *Melville* ***after*** settling, [A-434 ¶ 10];

- Callery's Counsel expanded the class definition only after filing for preliminary approval. [A-404]. While this increased HOP's exposure, HOP assented because it allowed a much broader release. *See Figueroa v. Sharper Image Corp*., 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007) (rejecting settlement where defendant "selected counsel confronted with a most precarious position, [and] insisted upon amendments to the pleading to broaden the scope of this litigation to obtain a global peace"); *Claridge v. N. Am. Power & Gas,* 15-CV-1261, 2017 WL 3638455, at *1–2 (S.D.N.Y. Aug. 23, 2017) (rejecting settlement that would "dramatically expand[] the class definition from a New York-only class to a [nationwide] class," triggering "scrutiny of whether the settlement was infected by a reverse auction");

- Callery's Counsel added a variable named plaintiff only ***after*** executing the Agreement and moving for preliminary approval, [A-234];

- Callery's Counsel coordinated a last-minute material modification of the Agreement with HOP at the final approval hearing, after the objection and opt-out deadlines lapsed, [A-42]; and

- In *Melville*, HOP argued the ICC Order would create "an inherent conflict" that renders counsel "inadequate" when multiple categories of customers are "seeking recovery from a single pool of HOP's assets, including potentially available insurance coverage." [A-78]. But when offered a global release for $0 out-of-pocket, HOP reversed course. HOP argued to one federal court that *Melville* ICC could not settle

variable and promotional variable claims but teamed up with Callery's Counsel to settle them in a different court.

"A trial judge's instinct, in our adversarial system of legal justice, is to approve a settlement, trusting the parties to have negotiated to a just result as an alternative to bearing the risks and costs of litigation. But the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). This Court should vacate this reverse-auction settlement. *See Cmty Bank I,* 418 F.3d at 318 ("[T]here is little in the record to give us confidence that the District Court exercised its fiduciary duty to assure that the settlement process was procedurally fair.").

## IV. The District Court Improperly Applied a Presumption of Adequacy

"The party seeking certification bears the burden of establishing that all requirements of Rule 23 have been satisfied." *Hydrogen Peroxide*, 552 F.3d at 322 (quotation omitted); *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 334 (3d Cir. 2011) ("[T]rial courts must conduct a 'rigorous analysis' of Rule 23's prerequisites." (citation omitted)).

This Court has long held that "a judge cannot presume that the putative class counsel actively represented the absentees' interests[.]" *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 791 (3d Cir. 1995); *see also id.* at 795 ("Inasmuch as collusion, inadequate prosecution, and attorney

inexperience are the paramount concerns in precertification settlements, the need for the adequacy of representation finding is particularly acute in settlement class situations, given the inquiry's purpose of detecting cases where there is a likelihood that the litigants are involved in a collusive suit." (cleaned up)); *Hydrogen Peroxide*, 552 F.3d at 321 ("deference or a presumption in" favor of party seeking certification "is an inadequate and improper standard"). "For viable settlement classes, *Amchem* and *Ortiz* made clear that expediency could not negate the requirements of Rule 23, which serve to protect absent class members." *Sullivan*, 667 F.3d at 336.

Yet the District Court applied a presumption of adequacy and placed the burden on Appellants to disprove adequacy: "[i]n certifying a class under 23(a), class counsel are presumed adequate." [A-19]. This presumption was based on a sole district court case from 1984, ignoring decades of contrary precedent. [*Id.*] (citing *In re Asbestos School Litig.*, 104 F.R.D. 422, 430 (E.D. Pa. 1984)). The District Court then analyzed each fact Appellants raised through the lens of presumed adequacy, finding Appellants failed "to overcome the presumption of adequacy of class counsel." [*Id.*].

This incorrect presumption was stated repeatedly. *See, e.g.*, [A-18] ("[T]he abilities of the class representatives and counsel to adequately represent the class are presumed[.]"); [A-19] ("None of these reasons are compelling enough to overcome the presumption of adequacy of class counsel."); [A-25] ("Objectors' various

arguments do not overcome the presumption of adequacy of class counsel."); [*id.*] ("In certifying a class under 23(a), class counsel are presumed adequate, Objectors' complaints about class counsel do not overcome this presumption[.]").

Presuming adequacy is an abuse of discretion warranting reversal. *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 315 (3d Cir. 2010) ("*Cmty. Bank II*") ("[W]e conclude the District Court applied an incorrect legal standard, and thus abused its discretion, in determining that the named plaintiffs and class counsel are adequate representatives for the class."); *see also Hydrogen Peroxide*, 552 F.3d at 322 ("To the extent that the District Court's analysis reflects application of incorrect standards, remand is appropriate."). "As is the case here, however, a district court abuses its discretion when it applies an incorrect legal standard." *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 444 (3d Cir. 2024). This is especially so here, where Rule 23(a) factors "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

This error was not merely technical; the record shows that Callery's Counsel are inadequate. They fail Rule 23(a)(4)'s requirements of sufficient experience, vigorous prosecution, and remaining free of conflicts with the class. Callery's Counsel have zero prior experience helming a class action, negotiating a class settlement, or readying such a case for trial. [A-429]. This inexperience caused persistent prejudice to, and conflicts with, class members.

The District Court agreed about Callery's Counsel's lackluster performance, criticizing them for spending "less than three hours per week on the action," and holding their fee request was "not appropriate . . . [g]iven counsel's performance in this action[.]" [A-45].

Although Callery's Counsel's missteps are too numerous to list in full, the following illustrative errors prejudiced absent class members:

- Missing the court-ordered certification deadline, which forced the case into the trial pool on an individual basis and compelled a rushed, disadvantageous settlement, [A-422–23];

- Disclosing confidential information in the RICO Filing, which triggered a sanctions threat and subordinated the class's interests to Callery's Counsel's desire to salvage its fee, [A-424];[7]

- Repeatedly asserting there are "many" uninjured capped price class members, [A-427], yet refusing to "winnow out" uninjured capped-price customers, instead deriding that process as "very time consuming," "expensive," and "not practical," [A-670];

- Agreeing to have class members pay HOP's ongoing legal fees, [A-42];

- Accepting HOP's bankruptcy bluff, since debunked by HOP's thriving business 18 months after the settlement, [A-415, A-556];

---

[7] This alone warrants reversal. *See, e.g.*, *Kim v. Allison*, 87 F. 4th 994, 1001 (9th Cir. 2023) (rejecting settlement by plaintiff with strong "interest in settling . . . even at the cost of a broad release of other claims"); *see also In re Am. Exp.*, 11-MD-2221, 2015 WL 4645240, at *18 (E.D.N.Y. Aug. 4, 2015) (misconduct "created a conflict" and risk of "settlement terms that are worse for class members than the terms he might have negotiated absent that conflict"); *Baum v. Ability Recovery Servs., LLC*, 17-CV-5799, 2018 WL 4853048, at *10 (E.D.N.Y. Sept. 27, 2018) (similar).

- Assuming class members would recover nothing in bankruptcy, which created a false justification for an inadequate settlement, [A-417];
- Misrepresenting that "HOP's liability insurance policy [is] the only asset available to the Class," [A-367], despite admitting that "HOP was willing to contribute to a settlement of its own funds in addition to the insurance policy funds available," [A-112–13 ¶ 11)];
- Failing to disclose critical information in the class notice, *infra* § VI;
- Arguing Appellants' discovery motion seeking HOP's financial projections was "delusional" because "projections are just made up numbers, guesses about the future," when Callery's own expert expressly requested financial projections, [A-667];
- Omitting material information at final approval, even though Appellants raised these omissions in their objections, *see infra § VII*;
- Making contradictory representations about elements of class certification, [A-427] ("One thing is virtually certain, which is that not every single customer has been injured in the same manner as [Mr. Callery.]"); [A-677] ("[Mr. Callery] was injured in the same way as every other Class member.");
- Failing to address ascertainability in the final approval briefing. [A-846–47]. This is particularly noteworthy because Appellants filed an ascertainability objection ***before*** Callery's Counsel submitted their final approval papers, [A-428]; and
- Attempting to amend the Agreement at final approval after the objection and opt-out periods passed. [A-906–07].

Additionally, the settlement "lacked structural assurances of fair and adequate representation for the diverse groups and individuals affected." *Cmty. Bank II*, 622 F.3d at 311 (quoting *Amchem*, 521 U.S. at 627). Variable and promotional variable claims are more valuable than capped claims, [A-686], and those customers thus

have "disparate interests" requiring separate counsel. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251 (2d Cir. 2011) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999)); *see also id.* at 252 (Only separate counsel "can ensure that the interests of that particular subgroup are in fact adequately represented."). Nevertheless, Callery's Counsel avoided separate counsel for variable customers.

The District Court must conduct a rigorous analysis and cannot rely on an improper presumption. Given the copious evidence of inadequacy, this Court should hold Callery's Counsel inadequate, or at minimum, remand to the District Court to determine adequacy under the proper standard.

### V. The District Court Violated Class Members' Due Process and Rule 23 Protections by Approving Material Alterations to the Settlement Agreement After the Objection and Opt-Out Deadlines

Approving a material modification of the Agreement at final approval—after the objection and opt-out deadlines—violated due process and Rule 23(e). Courts cannot approve material modifications of class action settlements at final approval. By that time, absent class members' time to opt out or object has already passed.

The Supreme Court has made clear that "Rule 23(e) does not give the court the power, in advance of trial, to modify" a proposed settlement agreement, and the "options available to the District Court" are simply to accept or reject the proposal. *Evans v. Jeff D.*, 475 U.S. 717, 727 (1986). This Court is equally clear. "A district

court is not a party to the [class action] settlement, nor may it modify the terms of a voluntary settlement agreement between parties." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010); *Sullivan*, 667 F.3d at 312 (same).

Every other circuit court considering this issue applied the same rule. *See, e.g.*, *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011) ("Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement."); *Cox v. Shah*, 187 F.3d 629 (Table), at *7 (4th Cir. 1999) ("[T]he district court's power to approve or reject class action settlements under Rule 23(e) . . . does not permit it to modify the terms of a negotiated settlement."); *In re S. Ohio Corr. Facility*, 191 F.3d 453 (Table), at *4–5 (6th Cir. 1999); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1119–20 (11th Cir. 1995); *Walitalo v. Iacocca*, 968 F.2d 741, 750 (8th Cir. 1992); *Freeman v. B & B Assocs.*, 790 F.2d 145, 151 (D.C. Cir. 1986); *In re Warner Commc'ns Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986).[8]

---

[8] District Courts in this Circuit are in accord. *See, e.g.*, *Frederick v. Range Res. Appalachia, LLC*, 08-CV-288, 2022 WL 973588, at *25 (W.D. Pa. Mar. 31, 2022) ("[T]he Court is not empowered to change the provisions of the Settlement Agreement[.]"), *aff'd*, 22-1827, 2023 WL 418058 (3d Cir. Jan. 26, 2023); *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 490 (E.D. Pa. 2008) ("When passing upon a proposed settlement agreement of a class action this court either has to accept the settlement agreement or reject it."), *aff'd sub nom.*, 582 F.3d 524 (3d Cir. 2009).

Here, however, the District Court approved a material modification of the Agreement in the final approval order by allowing the parties to excise the Agreement's provision that required the settlement fund to pay Defendant's legal fees. [A-42]. Worse, no amended agreement was submitted. Instead, the District Court allowed the parties to modify the Agreement at the fairness hearing and briefing. [A-915–16] (The Court: "But this is a little unusual here. More than a little." [HOP's Counsel]: "[I]f we are waiving any recapture of those [legal fees], we are not – we are willing not to take it, then I don't think it's unusual at all, then.").

This modification was not *sua sponte*. The District Court was aware of this defect only because Appellants objected to it. [A-419]. The District Court sustained Appellants' objection in every respect except for expressly stating it was "sustained": "Objectors argue the settlement is inadequate because it pays the legal fees of HOP Energy and the risk of the diminishing settlement is borne by the class and not class counsel. Objectors' concerns here are legitimate." [A-42]. The District Court approved the Agreement but excluded that provision. [*Id.*]. That was an error of law for at least four reasons.

First, by agreeing with Appellants, the District Court effectively acknowledged that the Agreement was unfair and insufficient under Rule 23(e). This requires rejection of the settlement. Second, a last-minute amendment after the objection and opt-out deadlines violates due process. *See In re Diet Drugs Prods.*

*Liab. Litig.*, 431 F.3d 141, 145 (3d Cir. 2005) ("A class member must have certain due process protections in order to be bound by a class settlement agreement."). Indeed, this Court has held that absent class members cannot be bound by statements made during a colloquy at final approval after the opt-out and objection deadlines passed. *See In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 310 (3d Cir. 2004) ("[D]ue process considerations counsel against binding absent potential class members to understandings that were not made express in the class notice or settlement agreement. And we are particularly wary of binding class members through statements made after the settlement was finalized and after they had to choose whether to opt out."). Third, the violative provision is not only substantively unfair in isolation but is also evidence that the settlement was not reached at arm's length and evinced Callery's Counsel's inadequacy. Rather than cure these fatal flaws, approving the Agreement without the offending provision blesses them. Fourth, allowing changes after the objection and opt-out deadlines passed opens the door to the precise type of gamesmanship and collusion the notice and opt-out procedures of Rule 23 were designed to prevent.

The final approval order should be vacated because it approved a materially modified settlement agreement, rather than the Agreement the parties presented.

## VI. <u>The Eleventh Hour Amendment Voided the Agreement</u>

By allowing the parties to excise the provision whereby class members paid HOP's attorneys' fees, the District Court triggered the Agreement's self-executing voidness provision. "The requirement that a district court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement." *Ehrheart*, 609 F.3d at 593; *Sullivan*, 667 F.3d at 312 (similar). There is "no doubt that the settlement agreement reached in this case is a binding and enforceable contract under general principles of contract interpretation." *Ehrheart*, 609 F.3d at 594. Under those principles, neither the Agreement nor the final approval order can stand.

Agreement Section 17.14 is clear:

> In the event that this Agreement is not approved by the Court in substantially its present form [or] any Objection to the Settlement is sustained by the Court . . . the terms and provisions of this Agreement shall have no further force and effect with respect to the Parties or the Settlement Class Members, . . . and any order or judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*.

[A-156]. The District Court triggered this provision both by declining to approve the Agreement "in substantially its present form" and by effectively sustaining an objection.

The District Court declined to approve the Agreement "in substantially its present form" by approving a different settlement fund than the Agreement provided.

Without it, class members would have paid HOP's attorneys after Callery's Counsel took their large share. This materially modified the amount class members could receive as well as the amount HOP would have to pay. In all respects, what the District Court approved was not the Agreement "in substantially its present form."

The District Court also sustained Appellants' objection about this fee provision. Despite incorrectly stating this objection was overruled, granting the relief the objection requested means it was in fact sustained. *See Sustain*, Black's Law Dictionary (12th ed. 2024) ("(Of a court) to uphold or rule in favor of <objection sustained>."); Federal Judicial Center, *Federal Courts and What They Do* 13 (1997) ("The judge can either sustain the objection and do as the objecting lawyer requests, or overrule it and [reject the request].").

Because the District Court triggered the Agreement's self-executing poison pill in two ways, the Agreement "shall have no further force and effect" and the final approval order "shall be treated as vacated, *nunc pro tunc*." [A-156]. Yet the District Court never addressed Appellants' argument regarding Section 17.14, which is itself reversible error. "[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 322 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (reversing for failure to consider "all relevant evidence and arguments . . . whether offered by a party seeking class certification or by a party opposing it").

This Court should vacate the final approval order and hold the Agreement is void as a matter of law.

## VII. Callery's Counsel Refused to Exclude Uninjured Capped Price Customers from the Class

Callery's Counsel admitted the settlement class includes "many" uninjured capped-price customers. [A-427, A-933]. Under Third Circuit precedent, this triggered counsel's responsibility to put forward a "plausible straightforward method" to exclude them from the class. *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 158 (3d Cir. 2023) (citation omitted). Callery's Counsel refused.

Callery alleged that when prevailing prices were lower than the capped rate, HOP charged capped customers the higher capped price. Thus, capped customers who only purchased when the prevailing rate was above the cap were not injured. There is record evidence of "many" such uninjured capped customers, including Callery's Counsel repeated admissions:

- "[M]any [capped price] class members may have no out-of-pocket loss . . . ." [A-427].
- "Plaintiff has conceded that not every class member is likely to have incurred damages, because oil prices rise as well as fall. Defendant has proffered no logical explanation for assuming damages where we know none exists—during periods of rising prices." [*Id.*].
- "[I]n periods of rising prices, it is likely that no customers were injured. . . . One thing is virtually certain, which is that not every single customer has been injured in the same manner as Plaintiff." [*Id.*].

Callery's Counsel must therefore "show they can exclude these uninjured consumers." *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 04-CV-5898, 2010 WL 3855552, at *28 (E.D. Pa. Sept. 30, 2010); *see also Huber*, 84 F.4th at 157.[9]

The facts here are even more problematic than in *Huber*. Rather than the "lack of evidence" in *Huber*, Callery's Counsel admitted there are "many" uninjured capped class members but nevertheless refused to offer any mechanism to identify or exclude them. In their final approval briefing, Callery's Counsel declined to perform any "customer-by-customer analysis" to "winnow out" these individuals, disparaging the task as "very time consuming," "expensive," and "not practical." [A-670].

In Callery's Counsel's own words, "Objectors complain that the payout formula may result in payments to customers who did not, in fact, incur any economic damages. As noted above, it is not reasonable or practical to ask the Settlement Administrator to conduct 50,000 customer analyses and attempt to calculate exact economic damages for each customer." [A-671]. At the final

[9] Like in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 461 (2016), "this problem" is "one of [Callery's Counsel's] own making." *Melville* ICC have argued ***for years*** that capped and variable cases must be litigated separately "for the precise reason that it may be difficult to remove uninjured [capped-price] individuals from the class after an award is rendered. It was [Callery's Counsel] who argued against that option and now seeks to profit from the difficulty [they] caused." *Id.* at 461–62.

approval hearing, Callery's Counsel reiterated that they "can't prove . . . that every [capped customer] had a financial hit." [A-921].

Callery's Counsel's admissions are dispositive and their excuses fail. First, Callery's Counsel is responsible for identifying and excluding uninjured class members. They cannot abdicate their fiduciary duty to the Settlement Administrator.

Second, when "it will be extraordinarily difficult to identify" uninjured class members, that precludes certification. *See Huber*, 84 F.4th at 157. Callery's Counsel argued both in the final approval briefing and at the final approval hearing that it would be "very time consuming," "expensive," and "not reasonable or practical" to identify these individuals. Accordingly, under *Huber*, the class cannot be certified.

Third, these admissions show the class is unascertainable and unmanageable. "[A]scertainability protects absent class members," and a class that includes uninjured members improperly "dilute[s] the recovery of true class members." *Carrera v. Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013) ("It is unfair to absent class members if there is a significant likelihood that their recovery will be diluted by fraudulent or inaccurate claims."). Even after Appellants raised this objection to ascertainability, Callery's Counsel did not address it in the final approval briefing. [A-846–47] (The Court: "Third Circuit law says address ascertainability. . . . You didn't brief it . . . [Callery's Counsel:] Yes, Your Honor. Ascertainability, I'm sorry I didn't brief it.").

Fourth, Callery's Counsel's unwillingness to exclude uninjured class members is yet more evidence of inadequacy. *See Carrera*, 727 F.3d at 310 ("If fraudulent or inaccurate claims materially reduce true class members' relief, these class members could argue the named plaintiff did not adequately represent them because he proceeded with the understanding that absent members may get less than full relief[.]").

The District Court was led to believe that uninjured customers were already excluded. [A-31–32]. But the District Court conflated distinct categories of customers and misconstrued Appellants' objection. Although the District Court correctly noted that "people who only bought via [COD] or people who only bought fixed prices are not included in the class," [A-31], that misses the point. Appellants' objection pertained to Callery's Counsel repeated admissions regarding uninjured ***capped*** customers, which went unaddressed.

The District Court cited three portions of the final approval hearing transcript to support its holding. [A-31–32 nn.119–21] (citing A-830, A-844, A-921). None of the cited colloquy demonstrates the exclusion of uninjured ***capped*** customers, but instead the opposite: Callery's Counsel excluded fixed and COD customers but not uninjured capped customers. [A-830] (fixed price customers excluded); [A-844] (COD customers excluded); [A-921] (Callery's Counsel: "[W]e can't prove . . . that every [capped customer] had a financial hit.").

Because Callery's Counsel admitted that there are "many" uninjured capped customers but refused to remove them from the class, this Court should vacate the final approval order that ignored this dispositive defect.

## VIII. Material Misrepresentations and Omissions in the Notice Prevented Class Members from Making an Informed Decision

The Notice contained falsehoods and material omissions. "[N]otices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice." *Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*, 22-1942, 2023 WL 1478999, at *6 (3d Cir. Feb. 2, 2023) (citation omitted). "Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013). This Court emphasizes "the importance of accurate and clear class action notices as a function of due process." *Perrigo Institutional Inv. Grp. v. Papa*, 150 F.4th 206, 220 (3d Cir. 2025).

The Notice was substantively deficient because it: (1) misrepresented the allocation plan under which class members would be paid; (2) misrepresented the factors used to determine payments; (3) omitted key metrics regarding class

members' recovery; and (4) omitted the primary driver of the settlement—HOP's purportedly dire financial position.

First, the method of calculating class member recovery described in the Notice is mathematically incompatible with the Agreement. The Notice promises class members a "pro-rata share" of the settlement fund, [A-570], but the Agreement instead uses a "points system" based on consumption quartiles and tiers, [*id.*, A-644]. A pro-rata share, by definition, ties class members' recovery to proportional harm. That is more equitable than the Agreement's tiers that lump disparate swaths of claimants together and provides identical recoveries regardless of differences in damages.

Further, because Callery's Counsel withheld the distribution of usage within the tiers—including unbounded high and low categories at the extremes—neither the class nor the District Court were ***able*** to assess the settlement's fairness. This structure violates Rule 23(e)(2)(D)'s mandate that class members be treated "equitably relative to each other." For example, the middle tier encompasses a range where some members had four times the purchases as others, with an identical recovery. [A-141 (§ 7.1.1))]. Moreover, the unbounded high and low ranges mean there could be 977-gallon customers compensated the same as 20,000-gallon customers. Without additional information about consumption amounts in the

unbounded tiers, it is impossible to assess the fairness of high- and low-end customers' compensation.

Pro-rata distributions avoid this problem, and it was improper to tell class members falsely that they would receive a pro-rata share. Rather than transparent disclosures, the Notice answered the most vital question—"How much will my estimated payment be?"—with the vacuous statement, "That depends." [A-406] (quoting A-164). The District Court acknowledged that using "pro-rata share" to describe the recovery was problematic but sanitized that falsehood by saying there is also "sufficient accurate information." [A-36]. It is an abuse of discretion to allow falsehoods in the Notice because other information happens to be true, especially where the falsehoods relate to class members' recovery.

Second, the Notice repeatedly falsely informed class members that compensation would be based in part on "the price(s) charged by HOP." [A-164, A-168, A-172, A-570]. This factor is not in the Agreement's distribution plan; another material falsehood told to class members. The District Court also made a clear error of fact when it described this disclosure as "accurate[]." [A-36]. This is not a part of the distribution plan in the Agreement, and the parties cannot argue otherwise.

Third, the actual payment metrics showed most customers would receive a pittance (between $7.33 and $40.34) for claims that could exceed thousands of

dollars. Callery's Counsel withheld this damning fact until after the opt-out and objection deadlines, denying class members the information to perform a rudimentary cost-benefit analysis before binding themselves. [A-715]. Courts must be "particularly wary of binding class members through statements made . . . after they had to choose whether to opt out." *In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 310 (3d Cir. 2004).

Fourth, the Notice was silent about the supposed primary motivation for the low-ball settlement: HOP's financial distress. This purported existential threat—the sole rationale for trading over $80 million in potential damages for less than 3% recovery—was omitted.

Callery's Counsel dismissed these critical disclosures as unnecessary: "The decision on the settlement was simple: Accept the remaining insurance proceeds or get nothing." [A-674]. But class members had no opportunity to make that "simple" choice because the Notice did not inform them of HOP's supposed financial distress. Worse, that false dichotomy was never true. *Supra* § VIII.

The District Court's failure to correct these errors warrants reversal. *See Gorgonzola*, 2023 WL 1478999, at *5 ("[D]istrict courts must closely monitor the notice process and take steps to safeguard class members from misleading communications from the parties or their counsel." (cleaned up)). The District Court

relied on the small number of objectors as proof of adequate notice. [A-33]. But that reasoning is circular. Class members left in the dark are unlikely to object.

Appellants raised the Notice's deficiencies early in the approval process but were ignored. This Court should vacate the final approval order because the District Court permitted insufficient Notice.

## IX. The Parties Withheld Key Information from the Court, Which Approved the Settlement on an Insufficient Record

Callery's Counsel failed to "provide the court with the information needed to evaluate the fairness or adequacy of a proposed settlement." *In re Nat'l Football League Players' Concussion Inj. Litig.*, 961 F. Supp. 2d 708, 715 (E.D. Pa. 2014); *see also* Fed. R. Civ. P. 23(e)(1)(A). Courts routinely reject class settlements where the parties, as here, fail to provide information "as to the class members' potential range of recovery." *Id.* (collecting cases).[10]

The parties withheld the amount of alleged overcharges in and across the settlements' tiers and up-to-date financial information to determine the accuracy of HOP's financial hardship claim.[11] The parties had this information and Appellants requested it; their failure to provide it is worrisome.

[10] These material omissions are also relevant to the Court's determination of adequacy of proposed class counsel. *See supra* § II.

[11] Callery's Counsel provided information about how class members' payments would be calculated, but in a completely different way from what they told class members. *Supra* § VI.

The District Court needed this basic information to evaluate the settlement's fairness and abused its discretion by finding that the scant disclosures provided at final approval were sufficient. District courts across the country have rejected settlements presented with similarly lacking information. *See, e.g.*, *Patterson v. Premier Constr. Co. Inc.*, 15-CV-662, 2017 WL 122986, at *3 (E.D.N.Y. Jan. 12, 2017) ("[T]he parties have provided virtually no information regarding class members' potential range of recovery and their proposed settlement must be denied on that basis."); *Custom Led, LLC v. eBay, Inc*, 12-CV-350, 2013 WL 4552789, at *9 (N.D. Cal. Aug. 27, 2013) (denying approval where parties provided no information on the "total amount of [relevant] fees paid in each [tier]").

For example, although Callery's Counsel presented limited information regarding estimated class-wide overcharges, that "back of the envelope" information is wholly conclusory and insufficient. Courts should not measure class action settlements based on the mere statement that "Plaintiffs' counsel's investigation revealed that Defendant could be found liable for over $80 million in damages." [A-641]. "[D]amages calculations offered to demonstrate the fairness of a proposed settlement must be substantiated with detailed, reasoned analysis that explains how the defendant's maximum potential exposure has been calculated." *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1075 (C.D. Cal. 2023). Here, Callery's Counsel

submitted a vague estimate about total overcharges without explaining their basis or describing them. This prevents a meaningful fairness inquiry.[12]

Worse, there was no information about the value of the claims in and across each tier of recovery. The District Court unfortunately misunderstood Appellants' objection, writing that they "provide no caselaw from this district, nor this circuit, to support their claims that detailed damages calculations are necessary." [A-23]. That is not accurate. Appellants cited *In re Nat'l Football League* (and persuasive authority from other districts) for the proposition that courts reject class settlements when parties fail to provide information "as to the class members' potential range of recovery" or other "information needed to evaluate the fairness or adequacy of a proposed settlement." 961 F. Supp. 2d at 715.

Without actual damages calculations in and across each tier of recovery, the District Court was unable to effectively analyze "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 2015). Accordingly, it had no way to determine whether the minimal settlement fund was

[12] This omission appears to be strategic. The bulk of damages stem from the more valuable claims of valuable variable and promotional variable customers represented by *Melville* ICC. However, Callery's Counsel did not disclose the alleged overcharges by tier. This too warrants rejecting the settlement.

fairly allocated across the three tiers, much less among the broad swaths of usage within those tiers. *See* Fed. R. Civ. P. 23(e)(2)(D). Because the District Court lacked key information, approving the settlement was an abuse of discretion.

### X. The District Court Failed to Resolve the Factual Dispute Regarding HOP's Ability to Pay by a Preponderance of the Evidence, Even Though That Is the Parties' Primary Justification for the Agreement

Callery's Counsel's justification for this weak settlement was HOP's alleged imminent insolvency. [A-921] (Callery's Counsel: "[T]his settlement was not based on weighing how much each class member deserved to get."). But HOP's own management, Callery's accountant, and Appellants' business valuation expert all agree that a larger settlement would ***not*** drive HOP into bankruptcy. Nevertheless, the District Court never weighed the evidence and declined to resolve the factual dispute of HOP's ability to pay.

First, HOP's management opined [redacted] [A-800]. HOP's admission should have been dispositive.

Second, Callery's expert explained that [redacted] [A-198].

Third, Appellants' business valuation expert opined that bankruptcy was "implausible." [A-559]. Appellant's expert further opined that "no reasonable person nor the court can make a justified estimate as to HOP's ability to pay a judgment or settlement" due to insufficient information, "even though [HOP] likely has the information necessary to make such a determination." [A-556].

Fourth, Callery's Counsel stated under penalty of perjury that "HOP was willing to contribute to a settlement of its own funds in addition to the insurance policy funds available." [A-614] (quoting A-112–13 ¶ 11). This makes sense, given the overwhelming evidence of HOP's financial strength: (1) HOP is owned by a thriving private equity firm, [A-614]; (2) HOP has over $300 million in annual revenue with an inelastic base of 81,000 customers, [A-839, A-857]; (3) just prior to the settlement, HOP completed a [redacted] acquisition of an HVAC company, which has been very profitable, [A-198, A-558]; and (4) HOP received a $75 million revolving credit facility to increase its liquidity, [A-80].

Nor would such a company go into bankruptcy without exploring alternatives. It is "likely that an entity [redacted] would explore every option to avoid filing for bankruptcy and shuttering operations." [A-559]. The District Court recognized this point. [A-912] (The Court: "[T]his company isn't gonna go down the tubes if it's making this much money

every year[.]"). Indeed, HOP remains a thriving enterprise years after its implausible claim of imminent doom.

Given the compelling evidence rebutting HOP's bankruptcy bluff, Appellants sought discovery of updated financial reports and recent financial projections, which HOP undoubtedly possessed. Callery's Counsel's response was to argue that "Objectors are delusional when they refer to projections of HOP's future revenues" because "projections are just made up numbers, guesses about the future." [A-667]. Notwithstanding this bluster, Callery's expert sought (but did not receive) these same projections. [A-725].

The District Court ignored Appellants' discovery motion until after granting final approval, almost a year after the motion was filed, denying it as moot without substantive reasoning. [A-9]. This too was reversible error. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008), *as amended* (Jan. 16, 2009).

The District Court further abused its discretion because: (1) it did not weigh the record evidence; and (2) rather than resolving the factual dispute, it deflected by stating that it "is not evaluating the negotiating skill of the parties." [A-42].

First, the substantial body of evidence warranted close scrutiny of HOP's ability to withstand a greater judgment. *See Hydrogen Peroxide.*, 552 F.3d at 322 (reversing certification because "in addressing the Rule 23 requirements, the court

did not confront [defense expert's] analysis or his substantive rebuttal of [plaintiff's expert's] points" or "weigh[] [defense expert's] opinion against [plaintiff's expert's] for the purpose of deciding whether the requirements of Rule 23 had been met."). The District Court never once mentioned Appellants' expert evidence, the other financial evidence cited herein, or weighed the conflicting evidence in a reasoned analysis. "Rule 23 calls for consideration of all relevant evidence and arguments, including relevant expert testimony of the parties." *Id.* at 325; *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("[A] district court must make its reasoning and application of the law clear, so that we, as a reviewing court, have a sufficient basis to review for abuse of discretion." (citation omitted)).

Compounding the District Court's failure to weigh evidence, it also did not address Appellants' argument rebutting Callery's Counsel's zero-recovery assumption in bankruptcy. Bankruptcy routinely results in distributions to unsecured creditors even where lenders (and the company) initially took the position that the lenders' security interests left nothing for unsecured creditors. Secured lenders, like everyone else, view bankruptcy as a last resort and are motivated to negotiate with unsecured creditors to avoid that outcome. Appellants further explained the many tools available to class members to collect in the unlikely event that this action

pushed HOP into bankruptcy.[13] Neither Callery's Counsel nor the District Court addressed these tools, despite undermining the zero-recovery bankruptcy assumption. By adopting Callery's Counsel's unsubstantiated assumption without scrutiny, the District Court abdicated its duty to weigh the value of the class's claims.

Second, HOP's ability to pay was a verifiable factual dispute central to evaluating the settlement's fairness. The District Court should have but did not resolve this dispute. Instead, the District Court's concluded that "[t]he Court is satisfied that HOP Energy's financial situation ***reasonably supports*** Plaintiffs assertions that HOP Energy could not withstand a greater judgment without jeopardizing class members' potential recovery." [A-41–42] (emphasis added). The District Court cannot merely hold that Plaintiffs' assertions were reasonably

---

[13] Appellants explained that secured lenders' security interests and other arrangements, like forbearance agreements, are routinely challenged in bankruptcy. The trustee (chapter 7) or creditors' committee (chapter 11) is expected to investigate and challenge them. 11 U.S.C. § 704(4) (trustee's duties); *id.* § 1103(c) (creditors' committee's investigative powers). Under Section 548 of the Bankruptcy Code, the debtor, trustee, or creditors' committee may avoid any lien or obligation incurred before bankruptcy for which the debtor did not receive reasonably equivalent value, where the debtor was insolvent (as suggested here), or the obligation was to an insider. 11 U.S.C. § 548(b). Both creditors' committees and trustees are known to pursue these claims aggressively. *See, e.g.*, *In re AmeriFirst Fin., Inc.*, No. 23-11240, 2024 WL 3841582, at *9 (Bankr. D. Del. 2024) (creditors' committee asserting claim for constructive fraudulent transfer against secured lender). Upon the avoidance of a lien, forbearance agreement, or other arrangement, the obligations are terminated and the encumbered value becomes available to unsecured creditors. Additionally, the debtor or trustee may claw back payments to an insider secured lender for up to a year before bankruptcy. 11 U.S.C. § 547. [A-418].

supported; "in deciding whether to certify a class" courts must "resolve factual disputes ***by a preponderance of the evidence***." *Hydrogen Peroxide*, 552 F.3d at 320 (emphasis added). Here, the District Court focused on whether it found Plaintiffs' beliefs reasonable. [A-42] ("It is not unreasonable for Plaintiffs to believe HOP Energy's concerns about bankruptcy and restructuring are legitimate."). Finding Plaintiff's allegations "not unreasonable" is not the same as finding that Plaintiffs proved them by a preponderance of the evidence. The latter was required.

The District Court abused its discretion both by failing to weigh Appellants' evidence and by declining to resolve the factual dispute over HOP's ability to pay by a preponderance of the evidence. *Hydrogen Peroxide*, 552 F.3d at 307, 320. This Court should remand with instructions to make a factual finding on HOP's ability to pay, ensuring the settlement is fair to the class.

## CONCLUSION

Appellants respectfully request this Court vacate the final approval order, decertify the settlement class, and remand the case.

Dated: March 24, 2026

Respectfully submitted,

/s/ Daniel J. Brenner
Daniel J. Brenner
**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
djb@wittelslaw.com
jbm@wittelslaw.com

**SHUB & JOHNS LLC**
Jonathan Shub
Samantha E. Holbrook
FOUR TOWER BRIDGE
200 BARR HARBOR DRIVE, SUITE 400
CONSHOHOCKEN, PA 19428
Telephone: (610) 477-8380
jshub@shublawyers.com
sholbrook@shublawyers.co

**CERTIFICATE OF COMPLIANCE**

I hereby certify that: (1) pursuant to Local Rule 28.3(d), I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit; (2) this document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,752 words, as determined by the word-count function of Microsoft Word, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f); (3) that this document complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5)(A) because it was typed in a proportionally spaced typeface using Times New Roman 14-point font; (4) in accordance with Local Rule 31.1.(c), the text of the electronic brief is identical to the text in the paper copies; (v) pursuant to Local Rule 31.1.(c), the electronic copy of this brief has been scanned for viruses using Sophos Premium version 10.11.5 and no virus has been detected.

Dated: March 24, 2026

/s/ Daniel J. Brenner
Daniel J. Brenner

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2026, the foregoing was filed via the electronic CM/ECF system of the United States Court of Appeals for the Third Circuit, which will send a notification of such filing to all counsel of record.

Dated: March 24, 2026

/s/ Daniel J. Brenner
Daniel J. Brenner